ARTHUR TELLER *vs*. CHARLES L. SCHEPENS.

No. 86-1175.

Suffolk.   October 16, 1987. — February 4, 1988.

Present: ARMSTRONG, SMITH, & WARNER, JJ.

*Medical Malpractice*, Expert opinion. *Negligence*, Doctor. *Witness*, Expert.
   *Evidence*, Expert witness, Rebuttal, Judicial discretion, Chalk drawing.
   *Practice, Civil*, Argument by counsel.

In a medical malpractice action, the judge correctly denied the plaintiff's
   request to present a rebuttal witness, where the testimony was effectively
   being offered only to bolster the plaintiff's case-in-chief. [350-351]
In a medical malpractice action, there was no error in the judge's permitting
   the defendant to use two slides as chalks to illustrate his testimony,
   where the slides were found to be relevant as well as useful to the jury,
   and where any differences between the depictions on the chalks and
   other evidence were brought out by the plaintiff on cross-examination.
   [351-352]
In a civil action, the plaintiff was not prejudiced by allegedly improper state-
   ments in defense counsel's argument to the jury, where the judge gave
   strong instructions, both before and after closing arguments, that the
   arguments were not evidence and the jury's memory of the evidence
   was controlling. [352-353]

CIVIL ACTION commenced in the Superior Court Department
on June 27, 1979.

After the decision of the Supreme Judicial Court in 381
Mass. 621 (1980), the case was retried before *Robert L. Stead-
man*, J.

*Ansel B. Chaplin (James S. Bolan* with him) for the plaintiff.
*Lionel H. Perlo* for the defendant.

SMITH, J.  The plaintiff brought an action for medical mal-
practice in the Superior Court against the defendant, an eye
surgeon. After a lengthy trial, the jury returned a verdict for
the defendant. On appeal, the plaintiff claims that the judge
erred in refusing his request to present a rebuttal witness and in

permitting the defendant to illustrate his testimony with allegedly misleading slides. He also claims that defense counsel committed prejudicial error in his closing argument.

We summarize certain evidence as general background of the case. On December 14, 1975, the plaintiff, a board certified psychiatrist practicing in New York city, was shot by the father of one of his psychiatric patients. The bullet entered his right temple, passed through his right eye, and exited over his left eyebrow.

The plaintiff was taken to a New York hospital, where he was treated by Dr. George Gombos, an ophthalmologist. Dr. Gombos determined that the vision in the plaintiff's right eye had been destroyed and that he had also suffered a concussive injury to the left eyeball and optic nerve. During a subsequent non-surgical exploration of the left eye, Dr. Gombos found that the optic disk was swollen and observed the presence of a massive retinal and vitreous hemorrhage.[1] Dr. Gombos informed the plaintiff there was an even chance that the vitreous hemorrhage would clear spontaneously within three to six months. If it did not, Dr. Gombos advised the plaintiff that he would need surgery to remove the blood because its toxic effect on the retina could destroy it.

The plaintiff was discharged from the hospital on December 24, 1975. On discharge, he did not have any vision in his right eye and only limited vision in his left eye. Dr. Gombos followed the plaintiff's progress closely and, by the end of January 1976, diagnosed secondary glaucoma in the left eye, that is, increased intraocular pressure resulting from the trauma. He also noted that the vitreous hemorrhage had failed to subside. Dr. Gombos

---

[1] The medical term, vitreous hemorrhage, refers to the presence of blood in the vitreous. The vitreous is a gelatinous body of matter that fills the part of the human eyeball between the lens and retina. The bullet had exited above the plaintiff's left eye without rupturing the globe of the eye. The bullet had, however, ruptured adjacent blood vessels which were the source of the bleeding into the vitreous.

decided to have the plaintiff seen by the defendant for an opinion as to whether a vitrectomy was indicated.[2]

The defendant, an eye surgeon with an international reputation, practiced in Boston. He first saw the plaintiff on April 2, 1976, and recommended an immediate vitrectomy in order to remove the hemorrhage and to reduce the intraocular pressure. The plaintiff, however, decided to return to New York and consider the defendant's advice. He consulted with several doctors as to whether a vitrectomy was necessary at that time. The plaintiff then decided to have the operation and returned to Boston on April 14, 1976.

On April 15, the defendant performed a vitrectomy on the plaintiff's left eye. He performed a second vitrectomy on April 21, and also removed the lens of the eye because it had become opaque. During that operation, the defendant discovered that the retina in the eye had become detached. On May 10, the defendant operated to repair the retinal detachment.

The plaintiff was next seen by the defendant on June 29, 1976. At that time the defendant examined the plaintiff's left eye and noted that it was gradually undergoing phthisis bulbi, a condition that results in permanent loss of vision. The defendant informed the plaintiff that nothing further could be done to restore the vision in his left eye. The plaintiff subsequently brought this action.

In his complaint, the plaintiff set out specific allegations of negligence on the part of the defendant. Those allegations included the defendant's recommendation that the plaintiff undergo eye surgery and a claim that the defendant failed to advise him of the risks associated with such surgery. He also alleged that the defendant was negligent in that he did not allow sufficient time between the operations for recovery from each preceding one or from the trauma of the gunshot wound.

1. *Exclusion of testimony of rebuttal witness.* The plaintiff claims that the trial judge committed prejudicial error when

---

[2] In a vitrectomy of the type which the defendant performed on the plaintiff's left eye, the vitreous, including any blood or clots, is removed surgically by means of a cutting and suction device. The vitreous is replaced simultaneously with another solution to maintain the shape of the eye.

he denied his request to present a rebuttal witness. The issue came about in the following manner. One of the physicians consulted by the plaintiff as to whether he should have a vitrectomy was Dr. Max Forbes. At trial, Dr. Forbes was called as a witness by the defendant. He testified that he had observed "three-plus cupping of the optic disk" in the plaintiff's left eye, which demonstrated the presence of severe glaucoma.[3] In Dr. Forbes's opinion, his observation signalled the need for an immediate vitrectomy. Dr. Forbes also testified that two other surgical procedures (paracentesis and trabeculectomy) were as risky as a vitrectomy and less effective in combating the type of hemolytic glaucoma present in the plaintiff's left eye.

At the conclusion of Dr. Forbes's testimony, the plaintiff's counsel informed the judge that he intended to call Dr. Vivian Boniuk as an expert witness for the purpose of rebutting the testimony of Dr. Forbes. The next day, the plaintiff's counsel submitted an offer of proof as to the contents of Dr. Boniuk's expected testimony. According to the offer of proof, Dr. Boniuk would testify that it would have been impossible for Dr. Forbes to determine with reasonable medical certainty on the first appointment whether the plaintiff's "three-plus cupping of the optic nerve" had a pathological origin as opposed to a physiological origin. Dr. Boniuk was further prepared to testify that, in 1976, procedures other than a vitrectomy were available to combat glaucoma and that those alternative procedures (paracentesis and trabeculectomy) were less likely to produce complications than a vitrectomy. After reading the offer of proof and listening to the arguments of counsel, the judge ruled that Dr. Boniuk could not testify as a rebuttal witness. The judge based his decision, in part, on lack of surprise to the plaintiff of Dr. Forbes's testimony and, in addition, that it would

---

[3]"Cupping" refers generally to a condition in which the optic disk appears somewhat concave or depressed when viewed under indirect opthalmoscopy. Cupping is measured on a scale of one-plus to four-plus. According to Dr. Forbes, four-plus is the most extreme, and three-plus means that there is severe damage to the eye.

be unfair in the circumstances to permit the plaintiff to have the "last say in the case."

"A trial judge has substantial discretion whether to permit the presentation of rebuttal evidence." *Drake* v. *Goodman*, 386 Mass. 88, 92 (1982). "There are circumstances, however, in which a party may present rebuttal evidence as a matter of right and in which the denial of that right would be an error of law." *Ibid*. These circumstances include "the right to introduce . . . competent evidence to rebut evidence of new facts appearing in the testimony of witnesses called by the opponent." *Commonwealth* v. *Wood*, 302 Mass. 265, 267 (1939). However, "[t]here is no right to present rebuttal evidence that only supports a party's affirmative case." *Drake* v. *Goodman, supra*.

One of the theories of negligence advanced by the plaintiff in his case-in-chief was that there were available other procedures, including surgical, that were less risky and more effective in lowering intraocular pressure than the vitrectomy performed by the defendant.[4] In support of that theory, an expert witness called by the plaintiff testified on direct examination that "there were other mechanical means with enormous potential of success and negligible risks, such as operations which lower pressure, which were more well-known and far more pertinent to control the [intraocular] pressure than vitrectomies." The same expert witness later testified, again on direct examination, that "there are glaucoma operations which are specifically performed to lower [intraocular] pressure. Vitrectomy, in general, was not one of them." At the suggestion of the plaintiff's counsel, the witness illustrated on a blackboard one such operation which he described as a "standard, long-term effective method of therapy for elevated [intraocular] pressure." Dr. Forbes's testimony as to the worth of the alternative surgical procedures was obviously in response to the testimony of the plaintiff's expert set out earlier in this opinion.

---

[4]According to the plaintiff's brief, he never attempted to "adduce[] evidence about other surgical procedures as part of his affirmative case." The record demonstrates otherwise. The statement in the brief is especially surprising because plaintiff's appellate counsel was also his trial counsel.

It did not introduce new facts into the case. In fact, because the availability of safer, more effective surgical procedures had already been raised in the plaintiff's direct case. Dr. Boniuk's testimony would not have been rebuttal testimony at all but was effectively being offered only to bolster the plaintiff's case-in-chief. The plaintiff does not have a right to present such testimony. See *Drake* v. *Goodman*, 386 Mass. at 93 n.5.

Dr. Forbes's testimony in regard to his observation of "three-plus cupping" also came as no surprise to the plaintiff. The record establishes that Dr. Forbes's notes of his examination of the plaintiff were in the plaintiff's possession well before trial. Those notes included the finding of "three-plus cupping." There is nothing in the record that shows that the plaintiff was surprised that Dr. Forbes was a witness for the defendant. In fact, plaintiff's counsel anticipated Dr. Forbes's testimony by including a reference to "three-plus cupping" in a hypothetical question that he posed to his expert. In sum, it is readily apparent that in the circumstances present here, the plaintiff did not have an absolute right to present Dr. Boniuk's testimony in rebuttal.

The plaintiff also argues that the judge abused his discretion in not permitting the rebuttal testimony. Dr. Boniuk was "noticed" by the plaintiff as one of his expert witnesses some four and one-half years prior to the trial. The subject of her testimony was one which could have been presented in the plaintiff's direct case. The plaintiff was not surprised by the testimony that he sought to rebut. Therefore, the experienced judge did not abuse his discretion in denying the plaintiff the right to present Dr. Boniuk's testimony.

2. *Permitting the use of certain slides by the defendant.* The plaintiff claims that the judge committed error when he permitted the defendant to use two slides as chalks to illustrate his testimony. The plaintiff objected to one slide because, he contended, it showed a different trajectory from that which the bullet actually took. On voir dire, the judge ascertained that the purpose of the slide was to show the effects of the impact

of the bullet, not its trajectory. The judge also made sure that a proper foundation had been laid before the jury saw the slide. There was no abuse of discretion, especially where the issue was fully explored on cross-examination. *Blair* v. *Pelham*, 118 Mass. 420, 421 (1875). *Horowitz* v. *Bokron*, 337 Mass. 739, 742-743 (1958).

The second slide was a photographic enlargement of the defendant's copy of a large drawing that he had made two weeks after the second operation. The plaintiff objected to the slide because it was an enlargement of a copy of the doctor's original drawing, rather than an enlargement of the original itself. The original drawing was part of the hospital record and in evidence. Before the slide was used, the judge found that it would be useful to the jury in understanding the defendant's testimony. The plaintiff cross-examined the defendant as to any differences between the slide and the original drawing. There was no error.

3. *Defense counsel's closing argument.* Defense counsel argued in closing that "[n]ever, never did a patient have as much information, as much knowledge about . . . the risks of the various procedures and the hoped-for benefits [as] Dr. Teller." The plaintiff argues that the statement was prejudicial because there was no foundation whatsoever for it in the evidence. According to the plaintiff, defense counsel's impropriety during his argument was further compounded by his misrepresentation that the plaintiff had "his own knowledge" and that of a "number of physicians down in New York." The plaintiff made a timely objection to the closing argument.

In closing argument, counsel may argue the evidence and the fair inferences which may be drawn from the evidence. *Mason* v. *General Motors Corp.*, 397 Mass. 183, 192 (1986). The jury had heard evidence that the defendant had informed the plaintiff of the risks of a vitrectomy. The jury had also heard evidence that the plaintiff was a physician who had studied the eye in medical school and who had consulted with several opthalmologists regarding his condition before he saw the defendant. There was testimony that after the defendant had recommended an immediate vitrectomy, the plaintiff had

consulted with several experts as to whether he should have the operation.

The plaintiff also argues that the "never, never" formulation amounted to an improper statement of fact because the inference might well be drawn that defense counsel had personal knowledge. According to the plaintiff, "[i]t implied that, as a senior lawyer, defense counsel had had extensive experience with medical malpractice cases and had never previously heard of or personally encountered a situation where a plaintiff knew as much as this one did."

We note that the plaintiff's closing argument followed the one complained of here. Thus, the plaintiff had ample opportunity to correct any misimpression that the jury might have received from defense counsel's closing argument. In addition, any prejudice was cured by the judge's strong instructions to the jury, before and after the closing arguments, that the arguments were not to be considered as evidence and that their collective memory of the evidence controlled, not that of the attorneys.

*Judgment affirmed.*